21-07374MB(JR)

## AFFIDAVIT OF BORDER PATROL AGENT-INTELLIGENCE ROBERT GOLDSBY

Your affiant, Robert Goldsby, Border Patrol Agent-Intelligence of the United States Border Patrol, being duly sworn, does depose and state the following:

### **INTRODUCTION AND AGENT BACKGROUND**

1.      I am a Border Patrol Agent with the United States Border Patrol (USBP) permanently assigned to the Tucson Sector Intelligence Unit at the Three Points Station.  I have been an agent with the USBP since September 12th, 2011.  I completed the USBP Academy on December 12th, 2011, where I received instruction in constitutional law, immigration law, criminal law, and federal and civil statutes. I have also received instruction in the detection, interdiction, and arrest of narcotics smugglers, alien smugglers, and aliens illegally present in the United States (U.S.). Since my assignment to the Sector Intelligence Unit in June of 2018, I have attended and completed advanced training on the following subject matters; advanced data system inquiries, evidence collection and interview techniques. Prior to my employment with the US Border Patrol, I served as a Correctional Officer II with the Arizona Department of Corrections. During this time, I was responsible for the internal movement, detention, and security device inspections of a level 4 unit.

2.      During my employment as a Border Patrol Agent (BPA) and, more frequently since my reassignment to the Sector Intelligence Unit, I have conducted multiple investigations involving illicit activity and have gathered and structured evidence and facts

1

pertaining to administrative and criminal cases. I have been an affiant for search warrants; conducted or participated in physical surveillance, participated in the execution of federal search warrants, taken sworn statements from material witnesses, seized and evaluated items of evidence. I routinely perform record checks through various law enforcement databases to establish accuracy of information as well as to gather facts further relevant to a respective case. I have acted as a liaison between the United States Attorney's Office, field agents, other state, and federal law enforcement agencies, and I have assisted fellow agents in the development of their cases through the use of my own training and experiences. My training and experience led to the direct participation of multiple investigations alongside Special Agents of Homeland Security Investigations (HSI). Based upon my training and experience, I am responsible for conducting investigations into violations of Title 8 of the United States Code.

3.     Based on my training and experience with Alien Smuggling Organizations ("ASOs"), my conversations and experience with other local, State and Federal agencies and my knowledge of this investigation, I affirm the following.

4.     I have learned that the utilization of cellular phones to communicate between alien smuggling coordinators, foot guides, load drivers, stash house operators, etc., is the most common form of communication.  When examining cellular phones law enforcement officials can uncover evidence that reveals or suggests who possessed or used the device; evidence of where such persons were when they possessed or used the device; evidence of

who such persons were with when they possessed or used the device; evidence of persons with whom they communicated when they possessed or used the device, evidence of text, email, photographs, additional electronic messaging applications, and voice mail communications between the person who possessed or used the device and others. It is quite common for navigational coordinates to also be transmitted to and/or from these devices to determine the user's location through a GPS application. In many border areas, scouts use phones to guide the groups to the pickup locations. This allows the guides to maintain a safe distance and insulate themselves from the group and thus evade apprehension. The guides are often located in the United States, but they may be located in Mexico as well. Since the majority of people have cell phones nowadays, the use of two-way radios has significantly been reduced. Smugglers also realize that is easier for law enforcement to intercept two-way radio communications versus a cellular phone. Drivers of scout vehicles are able to relay information to the driver of the load vehicle either with a direct call or with applications ("apps") such as WhatsApp, which allow the phone to function like a walkie talkie. Scouts will relay information such as the presence of Border Patrol. Drivers can also be guided by "pin drops" on apps such as Google Maps which will contain directions for the load vehicle. ASOs will utilize several different apps and functions on their phones to facilitate the coordination of a smuggling event, all the way from inception of the non-citizen to delivery of the non-citizen at the desired location in the United States. In addition, the apps that ASOs use may vary from cellular phone to cellular phone.

5.      The statements contained in this affidavit are based on information provided by fellow Border Patrol Agents are based on my experience as a Border Patrol Agent as well as the experience gained since being assigned to Border Patrol Intelligence. Since this affidavit is submitted for the limited purpose of securing a search warrant, I have not included all facts known to me regarding this investigation. I have set forth facts that establish probable cause to believe that the defendants referred to in this investigation conspired with each other and known and unknown individuals, wherein they jointly facilitated, either verbally or electronically, the movement of illegal aliens into and within the United States. This affidavit is intended to show only that there exists sufficient probable cause for the requested warrant and does not portray all of my knowledge about this matter.

6.      I submit this affidavit in support of an Application under Rule 41 of the Federal Rules of Criminal Procedure for a search warrant authorizing the examination of the contents of electronic communication devices capable of accessing the internet, defined below as **Target Device 1 (TD-1),** and the extraction from **TD-1,** of electronically stored information further described in Attachment B hereto.  Because this affidavit is being submitted for the limited purpose of securing a warrant to search **TD-1,** I have set forth only the facts that I believe are necessary to establish probable cause to search **TD-1.**

## IDENTIFICATION OF THE DEVICES TO BE EXAMINED

7.      The property to be searched consists of one cellular phone.  The cellular phone to be examined is:

4

i.   Blue OnePlus smartphone bearing IMEI number 990016802071314 with a serial number of S0746582 belonging to Richard Roger PROVOST (hereinafter, **TD-1**).

8.   **TD-1 is** currently stored at the Tucson Border Patrol Station Vault that is maintained by the Tucson Sector Seized Property Specialists. **TD-1** to be searched pursuant to the attached Application is further described in Attachment A hereto.

9.   The requested warrant would authorize the forensic examination of **TD-1,** for the purpose of identifying electronically stored data to include: any telephone numbers, including but not limited to numbers called, numbers stored for speed dial, pager numbers, names and addresses, electronically stored voice, and text messages, calling card numbers, text messages, photos, videos and/or identifying information that may be stored in the memory of **TD-1** as more fully described in Attachment B.

## PROBABLE CAUSE

10.   On July 31st, 2021, at approximately 1:15PM, the Tohono O'odham Police Department (TOPD) contacted the Tucson Sector Dispatch (860) regarding an encounter with a possible non-citizen smuggling vehicle on the Tohono O'odham Nation (TON) near the Hospital located in Sells, Arizona. Once dispatched, agents from the United States Border Patrol arrived shortly thereafter to the location of the TOPD vehicle stop located near Federal Route 24 and Main Street.

11.     Border Patrol Agents (BPA) arrived to find the driver and principal subject of the TOPD traffic stop seated in the back of a TOPD vehicle. The driver was identified as Richard Roger PROVOST (YOB:1963). TOPD Officers reported that they had witnessed PROVOST in the Basha's grocery store parking lot for 4-5 hours prior to observing him drive south onto Federal Route 19 (FR19) in a grey, 2019 Hyundai Sonata bearing AZ license plate BTA0874. TOPD Officers later witnessed PROVOST driving the Sonata north along FR19 approaching the Main Street intersection. TOPD Officers witnessed PROVOST run the stop sign located at this intersection and initiated a traffic stop for violation of TON code 28-855B.

12.     Upon approaching the Grey, 2019 Hyundai Sonata PROVOST had been driving, Border Patrol Agents observed three subjects dressed in camouflage attempting to hide within the interior of the Sonata. Agents on scene reported that one subject was laying on the floor of the front passenger seat area while an additional two subjects were laying along the back seat. Agents on scene determined that the three subjects laying in the Sonata were citizens of Guatemala who were not in possession of immigration documentation allowing them to enter, pass through or reside within the United States of America.

13.     Border Patrol Agents on scene requested records regarding the criminal history of PROVOST. These records indicated that PROVOST has previously been charged with the following crimes: burglary in the first degree, possession of narcotics/controlled substance, possession for sale of controlled substance, robbery, petty theft, burglary in the second degree, possession of a hypodermic needle/syringe, grand

theft, unlawful documents, stolen property, under the influence of a controlled substance and violation of parole.

14. After taking statements from TOPD Officers who initiated the vehicle stop and determining alienage of the three subjects within the Hyundai Sonata, PROVOST was subsequently placed under arrest by Border Patrol Agents on scene for criminal alien smuggling. PROVOST and the three citizens of Guatemala were then transported to the Tucson Sector Border Patrol Station for further processing in accordance with USBP protocol and Tucson sector guidelines.

15. Upon the completion of booking and intake at the Tucson Sector Border Patrol Station, PROVOST was advised of his Miranda rights on July 31st, 2021, at 6:48PM. The Miranda warning was given by Supervisory Border Patrol Agent (SBPA) Schilling and witnessed by BPA Hurst. PROVOST acknowledged verbally and by signature of CBP form I-214, that he understood his rights. PROVOST further agreed both verbally and by signature, on the same date and time, to waive his rights and provide a statement to agents regarding his role in the events leading to his arrest.

16. During a video-taped statement made in the English language, PROVOST stated that he was contacted telephonically by an unknown individual who was attempting to coordinate the movement of three non-citizens illegally in the United States. PROVOST stated that he agreed to transport the undocumented migrants for a payment of $3,000. PROVOST stated that he was then sent a link to his phone by the coordinator which

contained Global Positioning System (GPS) coordinates to a location along FR19 where the non-citizens would be waiting for PROVOST.

17.     PROVOST stated that he departed Phoenix, AZ the day before with the intention of picking up the three non-citizens along FR19 in return for payment. PROVOST told the agents that he traveled to the coordinates he was provided via Interstate 10 to Interstate 19 then traveled west along State Route 86 (SR86) until arriving in Sells, AZ. PROVOST stated that he was delayed from arriving to the pick-up location earlier due to the closure of SR86 stemming from a vehicle accident. Once SR86 was reopened, PROVOST stated he then proceeded to updated GPS coordinates that had been sent to his phone by the smuggling coordinator he was in communication with. PROVOST stated that he navigated to this updated set of coordinates when and where, three subjects he had no prior knowledge of, and who were all dressed in camouflage, entered his vehicle. PROVOST stated that he was instructed via another message to his phone from the smuggling coordinator to transport the three non-citizens to Phoenix but was pulled over by TOPD after driving for approximately 15 minutes.

18.     During this statement, PROVOST further admitted to agents that he had been smuggling non-citizens for the previous three months. PROVOST stated that he had successfully completed 10 prior smuggling trips. PROVOST further claimed that he would transport up to, but not more than six migrants per trip. PROVOST claimed that by smuggling no more than six migrants at a time, he would look less suspicious to law enforcement. In addition to picking up and smuggling migrants on the TON, PROVOST

stated that he had previously picked up in Deming, New Mexico. PROVOST stated that in previous smuggling events, he had transported non-citizens to locations as far away as Albuquerque and Santa Fe, New Mexico.

19.    Upon conclusion of taking video-taped statements from PROVOST, agents terminated the interview and stopped the video recording. Agents then asked PROVOST if he would be willing to consent to a search of his cellular device. In response to this request, both agents report that PROVOST became noticeably nervous, visibly upset, fidgety and uneasy. PROVOST stated that he did not want his electronic device searched as it could potentially cause him to be charged with additional crimes. The agents report that PROVOST was not forthcoming about what type of material his device might contain that would cause him to incur more criminal charges.

20.    After refusing a consent to search his cellular device, agents asked PROVOST if he would be willing to share the phone numbers within his device of those individuals who coordinated the transportation of undocumented migrants. PROVOST agreed and was permitted access to his phone. Agents report that PROVOST disabled multiple layers of security while attempting to unlock the device. PROVOST then stated that he ensures his phone is secured to ensure that no one would be able to access his phone. Upon unlocking the device, PROVOST provided agents with eight telephone numbers to the alien smuggling coordinator he was communicating with.

21.    Prior to this event, PROVOST was encountered under suspicious circumstances on May 18th, 2021, by Border Patrol Agents near Lordsburg, NM. During

this encounter, PROVOST, and his passenger John Phillip ALAMOND (YOB: 1992), were encountered while driving northbound on Highway 81. Border Patrol agents initiated a vehicle stop on Highway 146. PROVOST and his passenger ALAMOND stated that they were in the area to rock hunt based upon GPS coordinated they had been provided from a friend. When agents asked for these coordinates, PROVOST and ALAMOND told the agents they had already deleted the text message which contained the coordinates. After this encounter, agents suspected PROVOST and ALAMOND were in the area to smuggle non-citizens and reported the encounter to the Lordsburg Sector Intelligence Unit (SIU). Based upon this information, Lordsburg SIU filed a Law Enforcement Sensitive (LES) report.

22.     Based upon my training and experience as a Border Patrol Agent assigned to the Tucson Sector Intelligence Unit, communication devices such as cellular phones allow alien smugglers to communicate with each other, foot guides, load vehicle drivers, scouts and illegal aliens in order to coordinate precise actions within the smuggling event.  Cellular devices allow persons to conduct surveillance on law enforcement while alerting the conspiring parties to continue their criminal acts without notice by patrolling law enforcement.  Smuggling coordinators and load drivers routinely utilize cellular devices to communicate the location of where to transport illegal aliens, narcotics, and other contraband further into the interior of the United States.  The load drivers are provided precise times, locations, and instructions via cellular devices as their windows of opportunity to load non-

citizens into their vehicles are very narrow on the US/Mexico border due to the high presence of law enforcement.

23.     Based upon my training and experience as a Border Patrol Agent and statements made by PROVOST, I believe that the target device seized contains evidence which will demonstrate several months of communication between members of an alien smuggling operation. I believe that this evidence will prove beyond a reasonable doubt that PROVOST had knowledge that the actions leading to his arrest by the Unites States Border Patrol were criminal in nature. I believe that this evidence will reveal details of previous crimes committed by PROVOST to include the details of the 10 previous smuggling events to which he admits. I further believe that this evidence will reveal the identities of additional subjects located in the states of Arizona and New Mexico who are also involved in criminal alien smuggling.

24.     Since the date of the arrest, the target device has been stored in the Tucson Border Patrol Station (TUS) Vault that is maintained by the TUS Seized Property Specialist. The target device has been stored in such a manner that its contents, to the best of my knowledge, are in substantially the same state as when it first came into possession of the USBP.

## TECHNICAL TERMS

19.     Based on my training and experience, I use the following technical terms to convey the following meanings:

a. Wireless telephone: A wireless telephone (or mobile telephone or cellular telephone) is a handheld wireless device used for voice and data communication through radio signals. These telephones send signals through networks of transmitter/receivers, enabling communication with other wireless telephones or traditional "land line" telephones. A wireless telephone usually contains a "call log," which records the telephone number, date and time of calls made to and from the phone. In addition to enabling voice communications, wireless telephones offer a broad range of capabilities. These capabilities include: storing names and phone numbers in electronic "address books" or "contact lists;" sending, receiving and storing text messages and e-mail; taking, sending, receiving, and storing still photographs and moving video; storing and playing back audio files; storing dates, appointments and other information on personal calendars; and accessing and downloading information from the Internet. Wireless telephones may also include global positioning system ("GPS") technology for determining the location of the device.

b. Digital camera: A digital camera is a camera that records pictures and video as digital picture files, rather than by using photographic film. Digital cameras use a variety of fixed and removable storage media to store their recorded images. Images can usually be retrieved

12

by connecting the camera to a computer or by connecting the removable storage medium to a separate reader. Removable storage media include various types of flash memory cards or miniature hard drives. Most digital cameras also include a screen for viewing the stored images. This storage media can contain any digital data, including data unrelated to photographs or videos. Most cell phones currently manufactured contain digital cameras as a standard feature.

c.  Portable media player. A portable media player (or "MP3 Player" or iPod) is a handheld digital storage device designed primarily to store and play audio, video or photographic files. However, a portable media player can also store other digital data. Some portable media players can use removable storage media. Removable storage media include various types of flash memory cards or miniature hard drives. This removable storage media can also store any digital data. Depending on the model, a portable media player may have the ability to store very large amounts of electronic data and may offer additional features such as a calendar, contact list, clock or games. Most cell phones currently manufactured contain portable medial players as a standard feature.

d.  Internet: The Internet is a global network of computers and other electronic devices that communicate with each other. Due to the

13

structure of the Internet, connections between devices on the Internet often cross state and international borders, even when the devices communicating with each other are in the same state. Most cell phones currently manufactured allow the use of the Internet as a standard feature. Further, most current cell phones allow the user to transmit electronic messages via standard email services or specially designed communication applications between parties.

20.     In my training and experience, examining data stored on devices of this type can uncover, among other things, evidence that reveals or suggests who possessed or used the device; evidence of where such persons were when they possessed or used the device; evidence of who such persons were with when they possessed or used the device; evidence of persons with whom they communicated when they possessed or used the device; evidence of text, email, other electronic messaging applications and voice mail communications between the person who possessed or used the device and others. Navigational coordinates may also be transmitted to and/or from these devices to determine the user's location through a GPS application.  In many areas of the border scouts use phones to guide the groups to the pickup locations.  This allows the guides to maintain a safe distance and insulate themselves from the group and thus evade apprehension. Sometimes these guides are in Mexico, other times in the United States. Drivers of scout vehicles are able to relay information to the driver of the load vehicle either with a direct call or with apps such as WhatsApp, which allow the phone to function like a walkie talkie.

Scouts will relay information such as the presence of Border Patrol.  Drivers can also be guided by "pin drops" on apps such as Google Maps which will contain directions for the load vehicle.

## ELECTRONIC STORAGE AND FORENSIC ANALYSIS

21.     Based on my knowledge, training, and experience, I know that an electronic device such as **TD-1,** can store information for long periods of time.  Similarly, things that have been viewed via or uploaded to the Internet are typically stored for some period of time on the device. Additionally, computer files or remnants of such files can be recovered even if they have been deleted. This is because when a person "deletes" the information on an electronic device, the data does not actually disappear, rather, the data remains on the storage medium until it is overwritten by new data. Information described in this affidavit can often be recovered by forensic computer experts using forensic tools and software.

22.     As further described in this affidavit and Attachment B, this application seeks permission to locate not only electronically stored information that might serve as direct evidence of the crimes described on the warrant, but also forensic evidence that establishes how **TD-1** was used, where it was used, the purpose of its use, who used it, and when.

A.  Data on the storage medium can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file, including frequency channels, text messages, video, or photographs.

15

B.  Forensic evidence on a device can also indicate who has used or controlled the devices. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence.

C.  A person with appropriate familiarity of how an electronic device works may, after examining the forensic evidence in its proper context, be able to draw conclusions about how electronic devices were used, the purpose of their use, who used them, and when.

D.  The process of identifying the exact electronically stored information on a storage medium that are necessary to draw an accurate conclusion is a dynamic process. Electronic evidence is not always data that can be merely reviewed by a review team and passed along to investigators. Whether data stored on a computer is evidence may depend on other information stored on the computer and the application of knowledge about how a computer behaves. Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

E.  Further, in finding evidence of how a device was used, the purpose of its use, who used it, when and where, sometimes it is necessary to establish that a particular thing is not present on a storage medium, for example, the absence of the entry of a name in a contact list as evidence that the user(s) of device did not have a relationship with the party.

## CONCLUSION

23.     Based on the foregoing information, there is probable cause to believe that **TD-1** contains evidence related to the smuggling of illegal aliens for profit within the United

16

States.  The examination of **TD-1** may require authorities to employ techniques, including but not limited to computer-assisted scans of the entire medium, that might expose many parts of the device to human inspection in order to determine whether it is evidence described by the warrant. Because this warrant only seeks permission to examine a device already in the possession of the Border Patrol, the execution of this warrant does not involve the physical intrusion onto a premises. Consequently, there is reasonable cause for the Court to authorize execution of the warrant at any time in the day or night.  I submit that this affidavit supports probable cause for a search warrant authorizing the examination of **TD-1** described in Attachment A to seek the items described in Attachment B.


Robert R. Goldsby, BP/Agent - Intelligence
United States Border Patrol


Sworn to before me telephonically this
____18th____ day of August, 2021.


Honorable Jacqueline Rateau
United States Magistrate Judge
District of Arizona